**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

JESUS FERREIRA,

                         Plaintiff,

        vs.                                                        3:13-CV-107

CITY OF BINGHAMTON,
BINGHAMTON POLICE DEPARTMENT, and
OFFICER KEVIN MILLER

                         Defendants.

_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**


**DECISION and ORDER**

        Plaintiff Jesus Ferreira commenced the instant action pursuant to 42 U.S.C. §

1983 and state law, alleging that Defendants used excessive force against him when

executing a search warrant.  Defendants move for partial summary judgment.  The

parties have briefed the issues, and the Court has determined to decide the matter

without oral argument.

**I.      BACKGROUND**

        In the early morning hours of August 25, 2011, a Binghamton Police Department

SWAT team executed a "no-knock" warrant at 11 Vine Street, a residence in that city.

Plaintiff, an overnight guest, was sleeping on the couch in the living room, which was

located near the front door.  After using a battering ram to break through the front door,

officers entered the living room.  Defendant Kevin Miller, the first member of the SWAT

team to enter the building, shot the Plaintiff once.  Plaintiff suffered severe injuries, leading to the removal of his spleen.

Plaintiff sued the City of Binghamton, the Binghamton Police Department, and Officer Miller, among others.  Plaintiff alleged that Defendants violated his constitutional right to be free from excessive force and false arrest, both through the conduct of Defendant Miller and through the policies and practices of the Binghamton Police Department.  Plaintiff also raised state-law tort claims.  After motion practice, the only remaining Defendants were the Police Department, the City and Officer Miller.  At the close of discovery, Defendants brought the instant motion for partial summary judgment.  Defendants seek summary judgment on all Plaintiff's claims except his Fourth Amendment excessive force and state-law assault and battery claims.  The parties briefed the issues, bringing the case to its present posture.

## II.  LEGAL STANDARD

Defendants seek summary judgment.  It is well-settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and...the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving

party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, <u>Rexnord Holdings, Inc. v. Bidermann</u>, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998).

  With this standard in mind, the Court will now address the Defendants' motion for summary judgment.

## III. ANALYSIS

  Defendants seek partial summary judgment on a variety of grounds, which the Court will address in turn.

### A. False Arrest and Wrongful Imprisonment Claims

  Defendants first assert that the Court must dismiss Plaintiff's false arrest and false imprisonment claims because Plaintiff's detention was lawful as incident to the execution of a lawful warrant.

  The undisputed facts in this case indicate that on August 24, 2011, Binghamton Police obtained a search warrant for the residence of Michael Pride at 11 Vine Street, Binghamton, New York. Defendants' Statement of Material Facts ("Defendant's Statement"), dkt. # 86-1 at ¶ 2. The warrant authorized the arrest of Pride and the

search of the residence.  Id.  Officers had information that Pride was involved in drug transactions, and that he had a criminal history that included violent acts.  Id. at ¶¶ 3, 7. On the morning of August 25, 2011, Plaintiff was present in that apartment as Pride's guest.  Id. at ¶ 15.

At 6:37 a.m. on August 25, 2011, a SWAT team of eleven officers executed the warrant at 11 Vine Street.  Id. at ¶ 32.  Defendant Miller was the first officer in line.  Id. at ¶ 38(d).  He entered the apartment and almost immediately encountered the Plaintiff. Id. at ¶ 38(e-f).  While the parties disagree about the exact sequence of events, it is undisputed that Miller shot the Plaintiff from a short distance away.  Id. at ¶ 38(h).  After Miller shot the Plaintiff, officers handcuffed him and moved him away from a sofa in the living room, where Plaintiff had been staying.  Id. at ¶ 38(o).  Plaintiff remained handcuffed on the living room floor while officers cleared and secured the rest of the apartment.  Id. at ¶ 40.  Officers then called for a medic to treat Plaintiff's injuries.  Id. at ¶ 42.  Medics arrived on the scene at 6:44 a.m. and transported Plaintiff to a local hospital.  Id. at ¶ 44.  Two police officers accompanied Plaintiff to the hospital, where he underwent surgery.  Id. at ¶¶ 45-46.  These officers collected evidence from the Plaintiff at the hospital, including his clothing, wallet, keys, a ring, his cell phone, and $1,698 in U.S. currency.  Id. at ¶ 52.  The items were eventually placed in a police evidence locker.  Id.  Defendants admit that officers remained at the hospital until 4:15 p.m., long enough to permit the search of 11 Vine Street.  Id. at ¶ 54.

Plaintiff contends that officers violated his constitutional rights by detaining him without a warrant or probable cause.  Plaintiff does not challenge the validity of the warrant that permitted police to enter the apartment where he was shot.  He instead

claims false arrest. "Under New York law, a plaintiff claiming false arrest must show, *inter alia*, that the defendant intentionally confined him without his consent and without justification." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law[.]" Id.

The parties do not dispute that Plaintiff was taken into custody after Officer Miller shot him. Defendants claim, however, that Plaintiff's arrest was justified because he was present in the home when officers executed the warrant, and the Constitution permits officers to detain a person, even absent probable cause, during such a search. "The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures." Bailey v. United States, 133 S.Ct. 1031, 1035 (2013). The Supreme Court has found, however, that "officers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a proper search is conducted.'" Muehler v. Mena, 544 U.S. 93, 98 (2005) (quoting Michigan v. Summers, 452 U.S. 692, 705 (1981); see also, Rivera v. United States, 928 F.2d 592, 606 (2d Cir. 1991) (citing Summers, 452 U.S. at 705 ("Absent special circumstances, the police of course have the authority to detain occupants of premises while an authorized search is in progress.")). A detention under these circumstances is "appropriate . . . because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." Id. The right of officers "to detain incident to search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion imposed by the seizure." Id. (internal quotations omitted).

This "rule . . . extends farther than some earlier [warrant] exceptions because it does not require law enforcement to have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers." <u>Bailey</u>, 133 S.Ct. at 1038. Thus, Plaintiff cannot sustain a false arrest claim based on his arrest at the scene of the search–the constitution permits such detentions. The motion will therefore be granted with respect to those claims.

Plaintiff's detention extended far beyond the location of the search, however. Defendants admit that officers accompanied Plaintiff to the hospital and remained outside his hospital room until the search was completed, late in the afternoon. Defendants do not assert that they had probable cause to detain the Plaintiff. Since arrest for Fourth Amendment purposes occurs when "'there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest,'" the fact that officers remained outside Plaintiff's hospital room until the search was completed indicates that Plaintiff was in custody. <u>United States v. Newton</u>, 369 F.3d 369 F.3d 659, 670 (2d Cir. 2004) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)). In justifying detention at the hospital, Defendants rely on the Supreme Court's rule regarding detention incident to a lawful search of a residence. That rule does not apply under these circumstances, however. The Supreme Court is clear that "[d]etentions incident to the execution of a search warrant are reasonable under the Fourth Amendment because the limited intrusion on personal liberty is outweighed by the special law enforcement interests at stake." <u>Bailey</u>, 133 S.Ct. at 1042-43. "Once an individual has left the immediate vicinity of a premises to be searched, however, detentions must be justified by some other rationale." <u>Id.</u> at 1043. Plaintiff was not at

the scene of the search and Defendants have not offered another rationale for holding him.  The motion must be denied in this respect.

## B.    Use of Handcuffs

Next, Defendants argue that Plaintiff's excessive force claim must be dismissed to the extent that such claim relies on the use of handcuffs to detain him.  Defendants contend that the use of handcuffs to detain Plaintiff during the search was reasonable because police had information that weapons were present at the location.  Defendants' argument is in part predicated on the notion that, since Plaintiff's detention incident to the search was constitutional, the use of cuffs to restrain him during the search could not constitute excessive force.

Excessive force claims brought pursuant to the Fourth Amendment "'are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard.'" Shamir v. City of New York, 804 F.3d 553, 556 (2d Cir. 2015) (quoting Graham v. Connor, 490 U.S. 386, 388 (1989)).  Using "excessive force renders a seizure of the person unreasonable and for that reason violates the Fourth Amendment." Id.  To decide whether the force was reasonable, a court should pay "'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Soares v. Connecticut, 8 F.3d 917, 921 (2d Cir. 1993) (quoting Graham, 490 U.S. at 396).  This standard focuses on "'a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Brown v. City of New York, 798 F.3d 94, 100 (2d Cir. 2015) (quoting Graham, 490 U.S. at 397).

Defendants contend that they handcuffed Plaintiff because information provided before they executed the search warrant indicated that guns were in the apartment, and because they saw Plaintiff "digging" in the sofa and reaching with hands. Defendants' Statement at ¶ 38(o). Officers insist that they placed Plaintiff "wound side up in a 'recovery position'" on the floor of the apartment after handcuffing him. Id. at ¶ 38(p). Plaintiff disputes these facts, contending that he was laying on the couch when he was shot, and that police rolled him on his stomach to handcuff him. Plaintiff's Response to Defendants' Statement ("Plaintiff's Response'), dkt. # 89-1, at ¶ 38(p). He denies digging or reaching for anything while on the couch. Id. at ¶ 38(o). Plaintiff testified that officers handcuffed him, placing his hands behind his back. Plaintiff's Deposition, Exh. B to Defendants' Motion ("Plaintiff's Dep."), Dkt. # 86-3, at 81-2. Officers then placed him on the floor, where he lay on his right side. Id. at 82. Neither party offers clear evidence indicating who removed the handcuffs, or when.

Mindful that "[a] court's role in considering excessive force claims is to determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive[,]" the Court finds that a question of fact exists as to whether officer's use of handcuffs was reasonable under the circumstances. Brown, 798 F.3d at 103. Defendants contend that handcuffs were necessary to secure the premises and protect officers safety because officers had information that guns were on the premises and Pride had a record of violent felonies. They also insist that Plaintiff appeared to be reaching for something in the couch and presented a threat, requiring that he be cuffed for their protection. Plaintiff disputes these facts, however, insisting that he did not reach for anything after he was shot, but instead remained in one position. Under these

circumstances, a jury could reasonably find that the handcuffs were not reasonable under the circumstances.

Defendants, citing Muehler v. Mena, argue that because officers were permitted to use reasonable force to detain Plaintiff during the search, their actions in handcuffing the Plaintiff were necessarily reasonable under the circumstances.  Mena holds that "[i]nherent in Summers' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention."  Muehler, 544 U.S. at 98-99.  The mere right to detain incident to a search, however, does not automatically excuse the use of handcuffs.  As the Court noted in Muehler, "[t]he imposition of correctly applied handcuffs on Mena, who was already being lawfully detained during a search of the house, was undoubtedly a separate intrusion in addition to detention" itself.  Id. at 99.  Whether the handcuffing was reasonable under these circumstances is therefore a question for the jury.  The motion will be denied in this respect as well.

### C.    Eighth Amendment Claim

Defendants contend that any Eighth Amendment claims related to the denial of medical care must be dismissed.  Plaintiff was a pre-trial detainee, and such claims, they insist, must be analyzed under the Fourteenth Amendment.  Under that standard, Defendants argue that their conduct cannot reasonably be considered deliberate indifference to a serious medical need, and any such claim must be dismissed.  Plaintiff responds by stating that he has never alleged that he suffered from any such medical indifference.  The Court will therefore grant the motion as unopposed in this respect. To the extent that any of Plaintiff's claims could be construed to allege deliberate

indifference to a serious medical need, those claims are dismissed.

### D.     First Amendment Retaliation

Defendants argue that no evidence supports any First Amendment retaliation claims against them.  Plaintiff denies raising any such claims.  The Court will therefore grant the motion as unopposed in this respect.  To the extent that any of Plaintiff's claims could be construed to raise First Amendment causes of action, those claims are dismissed.

### E.     Malicious Prosecution

Defendants next contend that Plaintiff's malicious prosecution claim must be dismissed because Plaintiff was never charged with committing a crime.  Plaintiff denies raising such a claim.  The Court will therefore grant the motion as unopposed in this respect.  To the extent that any of Plaintiff's claims could be construed as malicious prosecution claims, those claims are dismissed.

### F.     Equal Protection and/or Section 1981 Claim

Defendants argue that Plaintiff's Amended Complaint fails to state a claim for a violation of his equal protection rights under 42 U.S.C. §§ 1981 or 1983.  Plaintiff responds that he did not attempt to raise "an independent claim for violation of [sic] Due Process Clause of the Fifth and Fourteenth Amendments, as plaintiff's Due Violation [sic] claim arises from 42 U.S.C. § 1983."  Plaintiff's Brief at 1.  Plaintiff's meaning here is not entirely clear to the Court, but Plaintiff offers no other argument connected to the Fifth or Fourteenth Amendments, where an equal protection claim would normally reside.  Plaintiff's arguments in reference to Section 1983 do not address the question of equal protection, but instead focus on Fourth Amendment issues and municipal

liability.  The Court therefore finds that Plaintiff does not oppose the motion on these grounds.  The Court will therefore grant the motion as unopposed.  Any equal protection claims raised by the Plaintiff will be dismissed.

**G.    Due Process**

Defendants also seek dismissal of any due process claims brought by the Plaintiff, whether procedural or substantive.  As explained above, Plaintiff has not offered any coherent argument on either of those issues.  To the extent that Plaintiff implies that his Section 1983 claims regarding his arrest and the force used to effect it are due process causes of action, such claims are covered by the Fourth Amendment and therefore not cognizable as a substantive due process violation.  See Velez v. Levy, 401 F.3d 75, 94 (2d Cir. 2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). The motion will therefore be granted on these grounds as well.

**H.    Municipal Liability**

Defendants argue that Plaintiff has not produced any evidence that his constitutional rights were violated due to a municipal policy or custom, and thus seek judgment on any claims against the City of Binghamton.  Defendants identify two possible areas of liability–failure to train and failure to supervise–and argue that Plaintiff has no evidence to support claims in either area.

Municipal liability is limited under Section 1983 by Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  In that case, the Supreme Court found that municipal liability existed "where that organization's failure to train, or the policies or customs that it has

sanctioned, led to an independent constitutional violation."  <u>Segal v. City of New York</u>, 459 F.3d 207, 219 (2d Cir. 2006).  To prevail, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  <u>Bd. of County Commr's v. Brown</u>, 520 U.S. 397, 403 (1997).  "A government's official policy may be 'made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'"  <u>Dangler v. New York City Off Track Betting Corp.</u>, 193 F.3d 130, 142 (2d Cir. 1999) (quoting <u>Monell</u>, 436 U.S. at 694).  Thus, claims against the City could be proved by showing that Plaintiff's rights were violated "pursuant to a governmental custom, policy, ordinance, regulation, or decision."  <u>Batista v. Rodriguez</u>, 702 F.2d 393, 397 (2d Cir. 1983).  Claims "premised on a theory of *respondeat superior* . . . cannot be the basis of municipal defendant liability under §§ 1981 or 1983."  <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 315 (2d Cir. 2015).  "[U]nder § 1983, local governments are responsible only for 'their *own* illegal acts.'"  <u>Connick v. Thompson</u>, 563 U.S. 51, 60 (2011) (quoting <u>Pembaur v. Cincinnati</u>, 475 U.S. 469, 479 (1986) (emphasis in original)).

### i.   Failure to Train

"Municipal liability may . . . be premised on a failure to train employees when inadequate training 'reflects deliberate indifference to . . . constitutional rights.'"  <u>Okin v. Vill. of Cornwall-on-Hudson Police Dep't</u>, 577 F.3d 415, 440 (2d Cir. 2009) (quoting <u>City of Canton v. Harris</u>, 489 U.S. 378, 392 (1989)).  To demonstrate such deliberate indifference, the plaintiff must demonstrate "(1) 'that a policymaker knows to a moral certainty that her employees will confront a given situation'; (2) 'that the situation either presents the employee with a difficult choice of the sort that training or supervision will

make less difficult or that there is a history of employees mishandling the situation'; (3) 'that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights.'" Id. (quoting Walking v. City of New York, 974 F.2d 298, 297-98 (2d Cir. 1992)). "'In addition, at the summary judgment stage, plaintiff must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007) (quoting Green v. City of New York, 465 F.3d 65, 81 (2d Cir. 2006)). A "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 563 U.S. at 61.

Plaintiff's argument on the failure-to-train issue consists mostly of a recitation of the legal standard. Plaintiff makes no attempt to point to any particular deficiencies in the City's training program that caused the constitutional violation. Plaintiff's moving papers do include the expert report of Gene Maloney, a twenty-year member of the New York City Police Department. See Exh. Y to Plaintiff's Response, dkt. # 89-27. Maloney's report contends that "[i]t does not appear that the police were properly trained with respect to the use of deadly physical force–which can only be used by a police officer where it appears to be **objectively** reasonable because of the **objectively** imminent threat of deadly physical force being used against the officer or someone else." Id. at ¶ 21 (emphasis in original). To support this contention, Maloney points to deposition testimony from the Binghamton Chief of Police, who admitted that he was unaware if police were taught the legal standard and acknowledged that lack was "extremely troubling, and leads to a culture of police using excessive force." Id. at ¶ 22.

13

Maloney thus contends that Binghamton police were "not properly taught when and under what circumstances they can use deadly force[.]" Id. at ¶ 23. Maloney also contends that "a review of the records indicate Binghamton SWAT had problems in their training prior to the August 25, 2011" incident and such problems were not corrected. Id. at ¶ 27. "This includes a lack of proper communications, an important part of the team functioning properly." Id. The only record Maloney cites is from a report on SWAT training conducted on May 26, 2010. That record indicates that SWAT team members needed improvement in some areas of their operations, such as "basic movement," "basic movement with shields, "stealth entries," use of gas masks, use of cameras, and use of other equipment. See Exh. T to Plaintiff's Response, dkt. # 89-22. Maloney makes no effort to analyze the contents of this training or to explain why failings in that training led to Plaintiff's shooting; he simply offers this record–which does not address excessive force in the least, to argue that Binghamton training was generally poor. Such evidence does not amount to evidence of constitutionally deficient training. To support this claim of inadequate training, Maloney cites to SWAT training records, but does not explain what that training entailed. Id. Maloney also criticizes the Police Chief's statements referring to the SWAT team as "toys," contending that such a cavalier attitude about the use of force would inevitably affect the rest of the police force. Id. at ¶¶ 30-31.

The Court will grant the Defendants' motion with respect to any Monell claims brought pursuant to a failure-to-train theory. Plaintiff has not pointed to any details about particular training the City provided, and has not attempted to explain in any detail how such training was deficient. Plaintiff has offered only generalized statements

14

that officers lacked adequate training about what conduct constituted excessive force. Plaintiff does not point to any particular training program and attempt to analyze the contents of that program to explain why particular deficiencies in that training led to the use of excessive force or a false arrest on the Plaintiff.  Plaintiff simply recites constitutional standards for the use of force and contends in a generalized way that officers did not receive training in that particular standard.  Plaintiff has therefore failed to identify any evidence demonstrating "a specific deficiency in the city's training program," much less explained how that alleged deficiency "is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation."  Amnesty Am., 361 F.3d at 129 (quoting City of Canton, 489 U.S. at 391).  The motion must be granted in this respect.

### ii.    Failure to Supervise

A municipality can also be liable for constitutional violations committed by subordinate employees if superiors "failed to supervise the [subordinates] in a way that would have prevented the violation of plaintiffs' constitutional rights."  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 127 (2d Cir. 2004).  To demonstrate municipal liability for failure to supervise in an excessive force case, a plaintiff may show "that the city's policymakers were 'knowingly and deliberately indifferent to the possibility that the police officers were wont' to violate the constitutional rights of arrestees."  Id. (quoting Fiacco v. City of Rensselaer, 783 F.2d 319, 326-27 (2d Cir. 1986).  A plaintiff can establish liability by showing "that 'the need for more or better supervision to protect against constitutional violations was obvious,' but that [defendants] made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct."  Id. (quoting

<u>Vann v. City of New York</u>, 72 F.3d 1040,1049 (2d Cir. 1995)).  Defendants argue that

no evidence exists to support a claim that the City of Binghamton ignored complaints of

excessive force and thus Plaintiff cannot prove deliberate indifference to the need for

training.

Plaintiff responds to Defendants' arguments by describing the circumstances

under which the warrant was served in this case, arguing that the officers who served

the warrant reacted inappropriately after failing in their first attempts to use a ram to

knock down the front door of the apartment.  Plaintiff argues that Police created a

racket and increased any danger they faced in attempting to enter an apartment where

evidence suggested the occupants would be armed.  They also, Plaintiff contends,

failed properly to plan for the operation.  They lacked evidence of the layout of the

apartment and did not know who they would encounter there.  This situation, Plaintiff

insists, "led to [Defendant] Miller firing his weapon when there was no objectively

reasonable belief that he, any of his SWAT Team mates, or anyone else was [in]

imminent deadly harm."  Plaintiff's Brief, at 12.  Given all of these facts, Plaintiff argues,

"it is clear Binghamton countenanced its employees routinely mishandling situations

involving the use of deadly force.  Defendants' acts and omissions violated Mr.

Fereeira's civil rights."  <u>Id.</u> at 13.

The Court finds this argument unpersuasive.  Plaintiff points to no systematic

and repeated failures to discipline and oversee officers' conduct in a way that would

lead a juror to conclude "that the city's policymakers were 'knowingly and deliberately

indifferent to the possibility that the police officers were wont' to violate the

constitutional rights of arrestees."  <u>Fiacco</u>, 783 F.2d at 326-37.  The evidence cited by

the Plaintiff instead points to the failings of the Binghamton Police in this particular incident. The evidence cited by the Plaintiff sounds in negligence, not intentional misconduct, and it does not represent any sort of repeated countenancing of unconstitutional conduct that could be seen as representing a policy or custom of the City. Plaintiff's argument is simply an attempt to make the City liable for the tortious conduct of its employees. Since *respondeat superior* liability is unavailable on a constitutional claim, the Plaintiff's argument is unavailing.

Plaintiff does point to evidence, however, that raises a possibility of a constitutional claim against the Defendant City. "A municipality may be found to have a custom that causes a constitutional violation when 'faced with a pattern of misconduct[, it] does nothing, compelling the conclusion that [it] has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" Okin, 577 F.3d at 339 (quoting Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007)). A Plaintiff can prove a Monell violation by showing that the municipality "had a custom whereby by it acquiesced to unconstitutional conduct by its officers." Okin, 577 F.3d at 440. "'[D]eliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.'" Okin, 577 F.3d at 440 (quoting Vann v. City of New York, 72 F.3d 1040,1049 (2d Cir. 1995)).

Plaintiff points to evidence in the record he claims indicates that the City was "well aware that there existed a pattern of misconduct, suggestive of inadequate training, by the number of allegations and complaints against the police department for civil rights violations." Plaintiff's Brief, at 15. Plaintiff's statement of material facts contends that the City of Binghamton was a defendant in eight federal and eleven state

lawsuits alleging false arrest or excessive force in the five years before the incident

here in question.  See Plaintiff's statement at ¶ 83.  He also points out that the Chief of

Police testified at his deposition that none of these incidents led the Chief of Police to

decide that additional training was necessary.  Id. at ¶ 84.  Plaintiff does not provide any

information, however, on the actual events underlying these cases, nor does he point to

any evidence concerning whether the officers in these cases faced any discipline.

Portions of the Police Chief's deposition, included in the Plaintiff's motion papers, do

not establish whether officers were ever disciplined for misconduct as a result of these

accusations of excessive force.  See Deposition of Joseph Zikuski, Exh. D to Plaintiff's

Resposne.  Plaintiff's attorney asked if any training methods had been changed

because of the legal claims filed against the City.  Id. at 261.  Zikuski responded that

"as far as I know most of them were unfounded, so I'd say no."  Id.

    The Court finds that Plaintiff has not presented evidence by which a reasonable

juror could conclude that the Defendant City of Binghamton had a custom of

acquiescing to excessive force used by Police officers.  As Judge Hurd has explained

"[t]he existence of repeated complaints" of police misconduct "is not sufficient" to

establish municipal liability."  Knicrumah v. Albany City Sch. Dist., 241 F.Supp.2d 199,

209 (N.D.N.Y. 2003).  A "combination of such complaints with the municipality's

response" is what "'tip[s] the scales toward the probative.'"  Id. (quoting Mendoza v. City

of Rome, 872 F.Supp. 1110, 1118 (N.D.N.Y. 1994)).  A showing of deliberate

indifference requires that a city's "response . . . amount to a persistent failure to

investigate the complaints or discipline those whose conduct promoted the complaints."

Id. (citing Fiacco, 783 F.2d at 328).  Here, mere proof that lawsuits alleging excessive

force had been filed against the City does not establish that excessive force actually occurred. Plaintiff has not introduced any evidence of the facts alleged in those cases or attempted to show their relevance–other than titular–to this matter. Second, the mere existence of such lawsuits does not establish the City's inadequate response to them or to other allegations of excessive force. Those lawsuits could not be used by a jury to determine that the City's response was deficient in a manner that signaled to officers that City officials considered excessive force acceptable. Third, the mere fact that the Chief of Police did not alter training on excessive force after learning of the lawsuits is not evidence that the City did not bother to evaluate allegations against officers or punish them when the City found them substantiated. Chief Zikuski's testimony is only evidence that training did not change. Plaintiff has therefore failed to present any evidence a jury could use to determine that a municipal policy or custom that led to a deprivation of his constitutional rights. The Court will grant the Defendants' motion in this respect.[1]

---

[1]Plaintiff's response points to a number of additional theories of <u>Monell</u> liability against the City. Plaintiff implies that decision to use a SWAT team represented a "failure to adequately plan" the operation, implicating municipal liability. Plaintiff cites <u>Estate of Smith v. Marasco</u>, 430 F.3d 140 (2d Cir. 2005) for the proposition that "[t]he decision to employ a SWAT team may violate the Fourth Amendment's prohibition on excessive force when objectively determining whether the circumstances justify use of a paramilitary force in a situation where the target is *merely suspected* of criminal wrongdoing." Plaintiff's Brief at 13 (emphasis in original). <u>Smith</u> does not address <u>Monell</u> liability. In evaluating whether individual defendants were entitled to qualified immunity for their decision to a use SWAT-style team in serving an arrest warrant on the decent, the Circuit Court noted that "a decision to employ a SWAT-type team can constitute excessive force if it is not 'objectively reasonable' to do so in light of 'the totality of the circumstances." <u>Smith</u>, 430 F.3d at 149. The Court then went on to determine qualified immunity applied to the officers who decided to use the SWAT team in that case. <u>Id.</u> at 150. The Court's decision had nothing to do with the existence of a municipal policy or custom, or a failure to supervise or train, and thus does nothing to

**I.      ADA Claims**

Defendants next seek dismissal of any claims under the Americans with Disabilities Act ("ADA") raised by the Plaintiff. Plaintiff denies making any such claims. The Court will therefore grant the motion as unopposed in this respect. To the extent that any of Plaintiff's claims could be construed to raise ADA causes of action, those claims are dismissed.

**m.      State-law Negligence Claims**

Defendants seek dismissal of Plaintiff's state-law negligence claims in a variety of categories.[2] The Court will address each in turn, as appropriate.[3]

---

address whether Monell liability exists here. Likewise, Plaintiff's claim that the City could be liabile under Section 1983 for a "failure to intervene" misunderstands the Monell standard. Courts are clear that "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). Plaintiff does not seek to impose individual liability on any officers who failed to intervene, but instead argues that such failures to intervene create liability for the City. That position again misconstrues how liability attaches to a municipality in a Section 1983 claim. Plaintiff seeks to make the City of Binghamton liable for the failures of individual officers. In other words, Plaintiff seeks to impose *respondeat superior* liability on the City. Such liability is clearly prohibited by Monell, and the Court must reject this argument.

[2]Plaintiff's Fifth Cause of Action alleges negligence. In relevant part, Plaintiff alleges that Defendants were negligent with respect to:

their improper use of force; use of excessive force; improper use of handcuffs; improper use of deadly physical force; use of excessive force; improper movement of the plaintiff's body; negligent performance of duties; negligent and wrongful entry, search and seizure; police misconduct; negligent infliction of emotional distress; denial, delay and obstruction of medical care and treatment; negligent hiring, training, supervision, monitoring and retention of agents, servants and employees; failed to have and/or properly use an early warning screening system for psychological profiles and failed to detect and/or respond in an appropriate manner to signs and symptoms presented by police officers involved herein; breach of special duty, failed to properly supervise, safeguard,

Defendants first argue that the Court should dismiss any negligence claims premised on the intentional conduct of Defendant Miller. Plaintiff responds that the evidence produced in discovery would permit a jury to conclude that Defendants violated the standard of care, and that this negligence injured him.

Courts are clear that "[w]hen a plaintiff asserts excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." Dineen v. Stramka, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002). At the same time, New York law permits a Plaintiff to recover when an officer, "in employing deadly physical force in an effort to apprehend plaintiff, did not exercise that degree of care which would reasonably be required of a police officer under similar circumstances." McCummings v. New York City Transit Auth., 81 N.Y.2d 923, 925, 613 N.E.2d 559, 560 (1993).[4] The Defendants are correct that a negligence claim could not lie if the jury concluded that Defendants' intentional conduct injured the Plaintiff,[5] but Defendants have not pointed to any

---

and monitor Plaintiff.

Amended Complaint at ¶ 47.

[3]All of Defendants' arguments are addressed to the sufficiency of the pleading. None address the sufficiency of the evidence.

[4]The Court notes that Defendants' argument here addresses the pleadings, rather than the evidence. Defendants argument fails in that respect, since "[u]nder Rule 8(e)(2) of the Federal Rules of Civil Procedure, a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency." Henry v. Daytop Village, 42 F.3d 89, 95 (2d Cir. 1994).

[5]In response, Plaintiff argues that Defendant Miller's conduct constituted a battery against him. A battery is certainly an intentional tort, not negligence. An intentional tort would certainly appear to be precluded by the case law cited above.

evidence of record indicating that a jury could only conclude that they acted intentionally. Defendants have moved for summary judgment and not moved to dismiss a pleading. That standard, as explained above, requires that Defendants show that no reasonable juror could find that the evidence in this case could support a negligence claim against them. Defendants do not assert that no evidence exists to support a claim that they failed to exercise the proper standard of care.[6] The Court will therefore deny the motion in this respect with leave to renew at the appropriate time during trial.

Defendants also contend that the Court must dismiss any claim for "negligent performance of duties." Defendants point to a series of cases where courts in New York have dismissed negligent investigation claims. Those cases, however, addressed situations where a plaintiff brought a claim alleging negligent investigation had led to the plaintiff's false arrest. See, e.g., Benard v. United States, 25 F.3d 98, 102 (2d Cir. 1994) ("Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution."); Coyne v. State of New York, 120 A.D.2d 769, 770, 501 N.Y.S.2d 505, 506 (3d Dept. 1986) (Finding there is "no legally cognizable cause of action exists for negligent investigation of a crime and claimant's only avenue of relief is by way of the traditional remedies of false arrest and malicious prosecution suits."). Plaintiff does not bring a malicious prosecution claim,

---

[6]Defendants' reply brief argues that local police regulations are irrelevant to proving a Fourth Amendment claim because the standard for such claims is not whether officers violated regulations or the standard care in a way that constituted negligence. Whatever the merits of that position, it does not address whether Defendants were negligent in a state-law sense.

and has withdrawn any Fourth Amendment false arrest claim.  As such, the rule cited by the Defendants does not apply to Plaintiff's actual negligence claims, and the motion will be denied in this respect too.

Defendants are correct, however, that Plaintiff cannot maintain a claim for negligent hiring and retention in this case.  "[U]nder New York law . . . '[a] claim for negligent hiring or supervision can only proceed against an employer for an employee acting *outside* the scope of [his] employment.'" Robinson v. County of Yates, 821 F.Supp.2d 564, 569 (W.D.N.Y. 2011) (quoting Stokes v. City of New York, 2007 U.S. Dist. LEXIS32787 at *53 (E.D.N.Y. 2007) (emphasis in original)).  "Where an employee is acting within the scope of his employment, the employer's liability for his conduct is imposed by the theory of *respondeat superior*, and no recovery can be had against the employer for negligent hiring, training or retention." Id.  No evidence in this case indicates that any Defendant or any City employee acted outside the scope of his employment and caused Plaintiff's injuries.  Plaintiff's injuries occurred when City police officers executed a warrant at the apartment where he was staying.  Officer Miller discharged his weapon into the Plaintiff as part of that procedure.  No reasonable juror could find that such conduct occurred outside the scope of Miller's employment.  As such, the Defendants' motion will be granted with respect to any claims against the City of negligent hiring, training, or retention.  Likewise, since Plaintiff admits that he brings no claims with reference to his medical treatment and care, any claim for denial, delay or obstruction of medical care must be dismissed.  The motion will be granted in this respect as well.

### n.    Defendant Binghamton Police Department

The parties agree that a claim against the Binghamton Police Department is duplicative of Plaintiff's claim against Defendant City of Binghamton. The motion will therefore be granted with respect to the Binghamton Police Department.

**o. Punitive Damages**

The parties agree that Plaintiff may not obtain punitive damages against Defendant City of Binghamton. The motion will therefore be granted with respect to these claims against the City only.

**p. Evidentiary Motion**

Finally, Defendants seek an order from the Court precluding the testimony at trial of Plaintiff's forensic pathologist, Dr. Scott F. LaPoint, as a rebuttal witness. Defendants argue that Plaintiff failed properly to disclose this witness and evidence about the position of Plaintiff's body when he was shot is evidence that should be part of the Plaintiff's case-in-chief. Thus, Defendants argue, the witness should be part of the case in chief.

The Court finds that this issue is one about the order of proof at trial and not one concerning the sufficiency of the evidence to support Plaintiff's claims. The Court will therefore deny the motion with respect to this witness's testimony with leave to renew at an appropriate time.

## IV. CONCLUSION

For the foregoing reasons stated above, Defendants' motion for summary judgment, dkt. #86, is **GRANTED** in part and **DENIED** in part, as follows:

1. The motion is granted with respect to:

   a. Plaintiff's Section 1983 claim for false arrest at the scene of the

search in question;

  b.  Plaintiff's Section 1983 Eighth Amendment claim;

  c.  Plaintiff's Section 1983 claim for malicious prosecution;

  d.  Plaintiff's Section 1983 equal protection/Section 1981 due process claims;

  e.  Plaintiff's <u>Monell</u> claims against the City of Binghamton;

  f.  Plaintiff's ADA claims;

  g.  Plaintiff's state-law claims for negligent hiring and supervision;

  h.  Plaintiff's state-law claims for delay and obstruction of medical care;

  i.  Plaintiff's claims against the City of Binghamton Police Department; and

  j.  Plaintiff's claims for punitive damages against the City of Binghamton.

2.  The motion is denied in all other respects.

**IT IS SO ORDERED.**

Dated: June 1, 2016

          Thomas J. McAvoy
          Senior, U.S. District Judge