**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JESUS FERREIRA,

Plaintiff,

vs. 3:13-CV-107

CITY OF BINGHAMTON,
BINGHAMTON POLICE DEPARTMENT, and
OFFICER KEVIN MILLER

Defendants.

---

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**

## DECISION and ORDER

The parties in this matter, which concerns a shooting of the unarmed Plaintiff by a member of the Binghamton, New York, Police Department, have filed post-trial motions. The Court has considered the motions on the filings and without the aid of oral argument.

## I. BACKGROUND

In the early morning hours of August 25, 2011, a Binghamton Police Department SWAT team executed a "no-knock" warrant at 11 Vine Street, a residence in that city. Plaintiff, an overnight guest, was sleeping on the couch in the living room, which was located near the front door. After using a battering ram to break through the front door, officers entered the living room. Defendant Kevin Miller, the first member of the SWAT team to enter the building, shot the Plaintiff once. Plaintiff suffered severe injuries,

leading to the removal of his spleen.

Plaintiff sued the City of Binghamton, the Binghamton Police Department, and Officer Miller, among others. Plaintiff alleged that Defendants violated his constitutional rights to be free from excessive force and false arrest, both through the conduct of Defendant Miller and through the policies and practices of the Binghamton Police Department. Plaintiff also raised state-law tort claims. After motion practice, the only remaining Defendants were the Police Department, the City and Officer Miller. After Defendants filed a motion for summary judgment, the case went to trial.

At the close of trial, the jury found that Defendant Miller had not committed battery or used excessive force against the Plaintiff. See dkt. # 170. The jury also found that Officer Miller had not been negligent with respect to the shooting. Id. The jury found, however, that the City of Binghamton had been negligent. Id. The jury awarded Plaintiff $500,000 in past damages and $2.5 million in future damages. The jury also found that Plaintiff was 10% liable for damages.

The parties filed post-trial motions. After the Court provided time for the preparation of the trial record, the parties filed briefs in support of their motions, bringing the case to its present posture.

## II. LEGAL STANDARD

Both parties seek judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. A court may grant judgment notwithstanding the verdict "only if the evidence viewed in the light most favorable to the non-movants, without considering credibility or weight, reasonably permits only a conclusion in the movant's favor." Doctor's Assocs., Inc. v. Weible, 92 F.3d 108, 111-12 (2d Cir. 1996). The Court "may

not weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury." Vermont Plastics v. Brine, Inc., 79 F.3d 272, 277 (2d Cir. 1996). A trial court may grant the motion only when "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" SEC v. Ginder, 752 F.3d 569, 574 (2d Cir. 2014) (quoting Tepperwiev v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 567 (2d Cir. 2011)).

In the alternative, the parties seek a new trial pursuant to Federal Rule of Civil Procedure 59, which provides that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" FED. R. CIV. P. 59(a)(1)(A). "'[A] decision is against the weight of the evidence . . . if and only if the verdict is [1] seriously erroneous or [2] a miscarriage of justice.'" Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 417-18 (2d Cir. 2012) (quoting Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 635 (2d Cir. 2002)). Such a motion can be granted "even if there is substantial evidence to support the jury's verdict." United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998). Though a trial judge "is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner . . . the court should only grant such a motion when the jury's verdict is 'egregious.'" DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998) (quoting Dunlap-McCuller v. Riese Organization, 980 F.2d 153, 157 (2d Cir. 1992)). Thus, "a court should rarely disturb a jury's evaluation of a witness's credibility." Id.

## III. ANALYSIS

### A. Plaintiff's Motion

Plaintiff seeks judgment as a matter of law pursuant to Rule 50(b) or, in the alternative, a new trial pursuant to Rule 59(a), arguing that the jury should have found Defendant Officer Kevin Miller liable for shooting him. Though the Court instructed the jury that it could find Defendant liable for battery or negligence in this matter, Plaintiff offers only a generalized argument and does not attempt to explain how Officer Miller could have been specifically liable under either theory. The Court will address each theory, after summarizing the relevant evidence elicited at trial.

#### i. Evidence

The trial in this matter consumed a number of days. Several police officers involved in executing the warrant that led to Plaintiff's shooting testified, as did the Police Chief and others involved in planning the action. Evidence indicated that Officer Miller shot Plaintiff very quickly after he entered the apartment. Plaintiff's case emphasized that Police botched the execution of the warrant by failing to use a sufficiently large ram to knock down the door, failing to obtain plans for the apartment, and failing to use alternative and less lethal means–other than guns–to incapacitate and subdue anyone in the apartment. Plaintiff contended that he had not been moving towards Officer Miller at the time he was shot, and that he did not have anything in his hands. He also alleged that officers placed an Xbox controller near his hand after the shooting in an effort to make it appear that he had appeared to present a danger to Officer Miller when he shot him. Two medical experts testified about the shooting, offering differing interpretations of Plaintiff's location at the time of the shooting and the

path of the bullet that injured him passed through his body.

Both Officer Miller and the Plaintiff testified about the shooting. Officer Miller testified that he was the first officer in line to enter the apartment. Trial Transcript ("T."), dkt. # 179, at 632. He had "the most dangerous spot" in the line of officers who entered. Id. Officers used a battering ram to enter the apartment. Id. Because the ram was too small, however, several strikes were required before the door could be opened. Id. at 634. For Miller, the delay in getting the door opened "felt like a long time." Id. Miller worried that the banging would wake everyone in the apartment–he feared that the officers had "lost the element of surprise." Id. at 635.

Examined by his attorney, Miller testified that he took "two to three steps" after he entered the apartment and before he shot Plaintiff. T., dkt. # 180, at 773. He estimated that a "[c]ouple [of] seconds" passed between the entry and shooting. Id. at 774. Miller testified that upon entering the apartment he saw "an individual coming off the couch, you know, coming towards me." Id. at 775. He looked towards Plaintiff's hands, "because hands are what will carry a weapon if there is one." Id. Miller testified that he shot Plaintiff because he thought he had something in his hands and was moving towards him, failing to comply with the officer's commands. Id. at 789-90.

Even before he entered the room, Miller testified that he was yelling "[d]own, down, down, down, down," and identifying himself as "Police." Id. at 776. He and other officers began these shouts as soon as they began to use the ram for entry into the apartment. Id. Plaintiff did not comply with this command to get down when Miller entered the apartment. Id. at 777. Miller testified that "[i]f someone's standing up after hearing those [commands] or if they did hear these [commands] and [are] making a

move towards you, without something even in their hands," that person was not complying with the command. Id. If a non-complaint person has something in their hand, Miller related, an officer would "respond in kind . . . You perceive it to be a weapon, you fire." Id. at 777-78. Miller further testified that the "no-knock" warrant in this case meant that, for the SWAT team:

> the only time we get called is if somebody reasonably believes or has done, you know, an investigation and they have a belief that there's you know, firearms or something, that they're a violent individual. Anything that would require that next step which is what we are. We're not your standard knock on your door, pull a car over, something like that.

Id. at 778.

Miller testified that the battering ram did not work well. Id. at 784. The door frame began to come apart, and the door itself would not "pop" open. Id. Eventually, the door "kind of shatter[ed] a little bit in pieces and start[ed] . . . kind of breaking down so you have kind of just a gap[.]" Id. Miller used his shoulder to break through that gap and clear a way for himself and the officers following him into the apartment. Id. When he entered and shot Plaintiff, he perceived that he had something in his hands. Id. at 790. Miller shot when he was concerned for his safety and the safety of the other officers entering the room. Id. Miller denied that he shot Plaintiff while he was "laying on the couch minding his own business with his hands in the air showing no resistance." Id. at 793-94.

Plaintiff's story of the shooting is quite different. He testified that on the night before the early morning raid that led to his shooting, he put a movie into the Xbox player, took his shoes off, relaxed, and "[l]aid down." T., dkt. # 182, at 1286. He used an "Xbox joystick" to operate the machine and make the movie play. Id. at 1290. Once

the movie started, he put the controller by his side on the floor. Id. at 1291. Plaintiff fell asleep at about two a.m. Id. at 1287. He woke up the next morning to "yelling and banging in the hallway." Id. at 1288. Still laying on the couch, he put out his arms and twisted towards the door in attempt to show that "I wouldn't be a threat to whoever was coming in." Id. "The door flew open and I seen a cop shoot me." Id. Plaintiff testified that he never got off the couch. Id. After his shooting, he saw "police running in the house, yelling, saying, you know, police, Binghamton, whatever they were saying. Freeze." Id. at 1289. Plaintiff screamed from pain and tried to pull himself up. Id. "I couldn't move."

Plaintiff testified that when police entered the room after shooting him, "[t]hey came over to me and flipped me on my stomach at the end of the couch and frisked my body or whatever and placed my arms over my head" in a position similar to if he were flying. Id. at 1291. He was lying on the couch. Id. at 1292. Eventually, Police laid him on the floor on his right side, handcuffed. Id. Plaintiff testified that "somebody yelled put the game joystick in his hand and that someone kicked it towards you as you lay on the ground." Id. at 1293. Plaintiff testified that he was on the couch when he was shot, was not "advancing on the police officer" and had nothing in his hands. Id. at 1294. Instead, he raised his hands, outstretched, to the officer as he entered the room. Id.

**ii. Excessive Force/Battery**

Plaintiff contends that the jury should have found that Officer Miller used excessive force and committed a battery when he shot Plaintiff after entering the apartment. Excessive force claims brought pursuant to the Fourth Amendment "'are properly analyzed under the Fourth Amendment's 'objective reasonableness'

standard.'" Shamir v. City of New York, 804 F.3d 553, 556 (2d Cir. 2015) (quoting Graham v. Connor, 490 U.S. 386, 388 (1989)). Using "excessive force renders a seizure of the person unreasonable and for that reason violates the Fourth Amendment." Id. To decide whether the force was reasonable, the fact-finder should pay "'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Soares v. Connecticut, 8 F.3d 917, 921 (2d Cir. 1993) (quoting Graham, 490 U.S. at 396). This standard focuses on "'a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Brown v. City of New York, 798 F.3d 94, 100 (2d Cir. 2015) (quoting Graham, 490 U.S. at 397). Under that standard, "'the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain and rapidly evolving–about the amount of force that is necessary in a particular situation.'" Rogoz v. City of Hartford, 796 F.3d 236, 246 (2d Cir. 2015) (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)). "To establish a claim of objective force, 'a plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, 'objectively unreasonable[.]'" Davis v. Rodriguez, 364 F.3d 424, 431 (2d Cir. 2004) (quoting Finnegan v. Fountain, 915 F.2d 817, 823 (2d Cir. 1990)). The same standard applies to Plaintiff's state-law battery claim. Posr v. Doherty, 944 F.2d 91, 94-5 (2d Cir. 1991).

Plaintiff contends that no rational juror could have found for Defendant Miller, and that the verdict represents a miscarriage of justice. For the jury to believe Miller's

story, Plaintiff contends, the jury would have to conclude that Plaintiff was "suicidal" and willing to ignore repeated calls to "get down." Plaintiff argues that Officer Miller's explanation for the shooting–that Plaintiff got up from the couch and moved towards him as he entered the room, carrying an Xbox controlled that looked like a revolver is so implausible that no juror could accept that claim. The Xbox controller looks nothing like a revolver, and officers testified that they found the device exactly where Plaintiff testified he left it the night before. Moreover, he contends, the next officer in line did not support Miller's testimony that Plaintiff was moving towards him when he entered the room, nor did the report of the shooting police prepared. The testimony of Plaintiff's pathologist about the angle at which the bullet entered Plaintiff's body also supports a finding that Plaintiff was on the couch when shot. Defendants respond that Plaintiff's argument does not really address the issue of excessive force, but instead concentrates on the negligence issue. Moreover, Plaintiff's arguments, Defendants contend, address only the standard for a new trial, not a directed verdict. Plaintiff cannot meet even that lower standard, Defendants insist.

The Court will deny the motion with respect to these claims. As for the motion for judgment notwithstanding the verdict, the Court cannot find that "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" Ginder, 752 F.3d at 574. A reasonable juror could certainly accept Miller's testimony that he shot Plaintiff after he entered the apartment and saw Plaintiff advancing on him with a device in his hand that appeared to be a weapon. The

SWAT team entered the apartment after being informed that occupants of the apartment likely had weapons, and after they had lost the element of surprise because the ram did not immediately open the door. A juror could credit Miller's testimony and reject Plaintiff's about what Plaintiff did as officers entered the apartment, and rejecting this testimony would lead the juror to conclude that the use of force was reasonable under the circumstances. Davis, 364 F.3d at 431.

Likewise, the Court will deny the motion insofar as it seeks a new trial on this issue. As explained above, the jury's decision here turned on a question of whose story to believe, Miller's or the Plaintiff's. If the jury had accepted Plaintiff's claim that he remained on the couch and raised his empty hands to Miller as Miller entered the room, the jury would have likely found that Miller lacked a reasonable justification for the shooting under the circumstances. The jury apparently believed Miller's claims that Plaintiff ignored his commands to stay on the ground, but instead moved towards him with an item in his hand that Miller–incorrectly–believed to be a gun. The Court does not find these conclusions to be either "'[1] seriously erroneous or [2] a miscarriage of justice.'" Raedle, 670 F.3d at 417-18 (2d Cir. 2012)). The Court will not disturb the jury's efforts to resolve the credibility issue in this case. DLC Mgmt. Corp., 163 F.3d at 134.

### iii. Negligence

As explained above, Plaintiff does not separate his argument regarding the jury's verdict concerning Officer Miller into the two claims the jury decided. Instead, Plaintiff simply argues that the facts of the case indicate that he did not pose any sort of threat to Officer Miller, and that by shooting Plaintiff when he did not pose a threat, Officer

Miller violated the standard of care. Defendants contest this claim, contending that the force used was reasonable under the circumstances.

Setting aside the issue of a special relationship, discussed below, a showing of negligence in New York requires that the Plaintiff demonstrate "(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result." Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112,116 (2d Cir. 2006). Plaintiff contends that the jury could only have found that Miller breached the standard of care by shooting him under the circumstances.

The Court will deny the motion in this respect as well. First, judgment as a matter of law is unwarranted under the circumstances, largely for the reasons stated above with reference to the excessive force/battery claim. Assuming that an officer breaches the standard of care by shooting an unarmed person without any justification, the facts related above demonstrate that Defendant Miller entered a room under circumstances where he had reason to believe he would encounter an armed and dangerous person. His testimony indicates he believed he had encountered such a person. Though mistaken, that mistake and the shooting that resulted does not indicate that he violated the standard of care in a manner in which no reasonable juror could fail to assign him liability.[1] The motion will be denied in this respect.

---

[1]Again, assuming that Miller could be liable for violating some standard of care, the evidence in this case is not such that a juror could find Miller violated the standard of care articulated in Rodriguez v. New York, 189 A.D.2d 166, 178, 595 N.Y.S.2d 421, 428 (1st Dept. 1993). Miller exercised his expert judgment in deciding to shoot in the specific circumstances of executing the warrant. He did not, as the officer in Rodriguez did, fire into a crowd of innocent bystanders without regard to their safety.

A new trial is likewise unwarranted. As explained above with reference to excessive force, the jury's decision about whether Miller violated the standard of care in shooting Plaintiff hinged on a question of credibility. The Court will not disturb the jury's decision in that respect.

**B. Defendants' Motion**

The Defendant City moves, in relevant part, for judgment as a matter of law. The City argues that, under the facts elicited at trial, the jury's finding that the City was negligent by its own conduct is legally and factually impossible.

The Second Circuit Court of Appeals has explained the circumstances under which a municipality may be liable in negligence to an injured party. When "a municipality . . . acts in a governmental capacity, a plaintiff may not recover without proving that the municipality owed a 'special duty' to the injured party." Velez v. City of New York, 730 F.3d 128, 135 (2d Cir. 2013).[2] To create liability, "'the duty breached'" by the municipality "'must be more than that owed the public generally.'" Id. (quoting Valdez v. City of New York, 18 N.Y.3d 69, 75, 936 N.Y.S.2d 587 (2011)). The plaintiff must prove that such a "special relationship" existed by demonstrating "four elements":

> (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

Id. (quoting Applewhite v. Accuhealth, Inc., 21 N.Y.3d 420, 430-31, 972 N.Y.S.2d 169,

[2]Plaintiff offers no response to Defendants' argument that a "special relationship" is necessary to prove negligence against the City.

176 (2013)); see also, Sorichetti by Sorichetti v. City of New York, 65 N.Y.2d 461, 468, 482 N.E.2d 70, 75 (1985) ("where there is no special relationship, a municipality does not owe a duty to its citizens in the performance of governmental functions, and thus courts will not examine the 'reasonableness' of the municipality's actions."). In other words, "under the 'special relationship' doctrine, a municipality may not be held liable in negligence for a police officer's failure[s] . . . absent the establishment of a special relationship with the plaintiff." Rodriguez, 189 A.D.2d at 172.

Plaintiff admits that he was "not the subject of the no-knock warrant for 11 Vine Street on the morning of August 25, 2011, and the police did not know he was in the apartment." No evidence at trial or in the record indicates that Plaintiff ever had any direct contact with the Binghamton Police or any Binghamton official before the SWAT team arrived to execute the no-knock warrant. Likewise, no evidence produced at trial indicated that the Defendant City ever took on any particular duty to the Plaintiff. Under those circumstances, no claim against the City for negligence could lie. As such, "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" Ginder, 752 F.3d at 574. The Court will therefore grant the Defendants' motion. Judgment as a matter of law will be granted to the City.[3]

---

[3]Defendants also argue that governmental immunity prevents the Plaintiff from collecting on a negligence cause of action against the City. New York courts have found that "[m]unicipalities surrendered their common-law tort immunity for the misfeasance of their officers and employees long ago[.]" Tango by Tango v. Tulevech,

As that decision absolves the City of any liability in this matter, the Court will decline to address the remainder of the City's motion.

**IV. CONCLUSION**

For reasons stated above, the Plaintiff's motion for judgment as a matter of law or, in the alternative, a new trial, dkt. # 175, is hereby DENIED. The Defendants' motion for judgment as a matter of law, dkt. # 174, is hereby GRANTED. The Clerk of Court is hereby directed to enter final judgment for the Defendant City of Binghamton and Binghamton Police Department on all claims raised in the Plaintiff's Amended Complaint.

**IT IS SO ORDERED.**

Dated: September 27, 2017

Thomas J. McAvoy
Senior, U.S. District Judge

---

61 N.Y.2d 34, 40, 459 N.E.2d 182 (1983). Still, "other recognized limitations still govern the tort liability of municipal officers." Id. Once such rule supplies that "when official action involves the exercise of discretion, the officer is not liable for the injurious consequences of that action even if resulting from negligence or malice." Id. Under this standard, "discretionary or quasi-judicial acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standards with a compulsory result." Id. This rule does not apply in "situations where the employee, a police officer, violates acceptable police practice." Lubecki v. City of New York, 304 A.D.2d 224, 234, 758 N.Y.S.2d 610, 617 (1st Dept. 2003). Plaintiff elicited evidence in this case that Miller's conduct violated acceptable police practices by shooting Plaintiff without first establishing he represented a danger. A jury did not, however, find that Miller violated such practices in shooting Plaintiff, and the City's immunity therefore would apply. Plaintiff elicited additional evidence that the City improperly investigated the home at 11 Vine Street and used improper judgment in planning the raid. The tort of negligent investigation, however, does not apply, as "it is well settled that an action for negligent . . . investigation does not exist in the State of New York." Ellsworth v. City of Gloversville, 269 A.D.2d 654, 657, 703 N.Y.S.2d 294, 297 (3d Dept. 2000).